**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )  )   1:17-cr-10079 | |
| **Plaintiff,** ) ) | |
| **vs.** ) ) | |
| **RUSSELL JANN,** ) ) | |
| **Defendant.** ) | |

**POSITION OF THE UNITED STATES AS TO PRESENTENCE REPORT
AND SENTENCING FACTORS**

Comes now the United States Attorney for the Western District of Tennessee by and through his duly authorized Assistant, Kasey A. Weiland, and takes the following position regarding the presentence report (PSR) prepared and filed in the above styled and numbered cause:

**I.  Offense Conduct**

The United States has no objections to the factual information contained in the PSR.

**II.  Guidelines Calculation**

    **A.  Objections**

The United States has no objections to the guideline calculations set forth in the PSR, and therefore requests no amendments or adjustments.

    **B.  Response to Defendant's Objections to Guideline Range**

Though Defendant does not formally object to his guideline calculation, he argues that his sentencing range is unduly harsh because it reflects "a series of enhancements that are applied in

1

almost every case, without distinction to the type of offender being sentenced." RE-30, Def. Pos. on PSR, PageID 81. In particular, Defendant argues that the application of the computer enhancement and the number of images enhancement results in an unfairly harsh guideline calculation, which in turn, justifies a sentence at the low end of the guideline range.

Defendant's argument that application of these enhancements to his case results in an unduly harsh sentencing range is without merit. His objection to the number of images enhancement is especially curious given the staggering volume of Defendant's collection. While an offender must only possess 600 images to receive the five-point enhancement under USSG §2G2.2, Defendant's collection was comprised of over *283,000* images.[1] Regardless of the frequency with which this enhancement is applied to other child pornography offenders, its application to Defendant is undoubtedly justified.

Moreover, in crafting the child pornography guidelines, the United States Sentencing Commission realized that specific offense characteristics that were being included would be applied in many, if not most, cases. U.S. Sentencing Commi*., The History of the Child Pornography Guidelines* (2009), at p. 10, available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/sex-offenses/20091030_History_Child_Pornography_Guidelines.pdf (last accessed January 31, 2018). For this reason, the Commission set the initial base offense level for the child pornography guidelines substantially lower than the old Parole Commission's categorization (upon

---

[1] Video files are counted as being equivalent to 75 images. *See* USSG §2G2.2 cmt. 6(B)(ii). Jann possessed over 2,600 videos (x 75 = 195,000 images) and 88,000 images of child pornography on his external hard drive. Some of the videos exceeded five minutes in length, which the guidelines suggest may warrant an upward departure. *Id.*

2

which the initial guidelines were based). This was based on the expectation that the specific offense characteristics would apply in many cases to increase the overall guideline calculation. *Id.* Thus, the oft-heard argument that Defendant now makes—that the Court should impose a low-end sentence simply because there are several Specific Offense Characteristics that are applicable in practically all cases—has little, if any, merit.

## III. § 3553 Factors

### A. Nature and Circumstances of the Offense

Child pornography offenses inherently involve the sexual abuse and exploitation of children. Victims are harmed initially during the production of child pornography, but the perpetual nature of the distribution of images on the internet causes a significant, separate, and continuing harm to victims.[2] Many victims live with persistent concern over who has seen images of their sexual abuse, and they suffer in the knowledge that their images are being used for sexual gratification and for the purpose of grooming new victims. Although those who trade, possess, and view child pornography are not responsible for the sexual abuse committed when the images were produced, they are no less culpable than the initial abuser when it comes to causing ongoing trauma to the victim and harm to the community at large.

As compared with others who are convicted of possession and receipt of child pornography, Defendant's offense conduct is more egregious than most. He did not merely collect child pornography that he found online, but also combed the internet for teenage girls that he could groom for a sexual relationship. In some cases, Defendant initiated contact by deceiving

---

2 This harm is described in heartbreaking detail in the victim impact statements that have been provided to the Court.

the girls about his true age and identity, representing himself as a teenage boy. Defendant exchanged sexually graphic texts and chats with numerous girls he met online. He sent the girls photographs of his penis and videos of himself masturbating. He sought and received similar photographs and videos of the girls in return. He expressed his desire to meet the girls in person to have sex. And in the case of at least one sixteen-year-old girl, Defendant did meet her in person and performed oral sex on her. Defendant also admitted traveling to Alabama to meet another sixteen-year-old girl with whom he had an online relationship, but stated that their sexual contact was limited to kissing and fondling.

In support of its request for a sentence at the upper end of the guidelines range, the United States notes that none of the foregoing relevant conduct is directly reflected in Defendant's guidelines calculation. Accordingly, his conduct is arguably more serious than his sentencing range would suggest. A high-end sentence is warranted.

### B. History and Characteristics of Defendant

Defendant reported a period of physical abuse as a child by his first stepfather and an early exposure to sex with a female cousin who was close to him in age.[3] Defendant has been married twice and has five children ranging in age from 26 to 16. He presently takes medication for migraines and hypertension. Defendant has a history of depression and reported that he contemplates suicide on a daily basis. Apart from youthful experimentation, Defendant has no history of drug abuse or addiction. Defendant likewise has no criminal history.

Despite his lack of criminal history, the combination of Defendant's interest in child

---

[3] Counsel characterizes the events described in Paragraph 58 of the PSR as Defendant having been "sexually molested by a much older" cousin. The United States respectfully submits that this is a mischaracterization of the facts set forth in Paragraph 58.

4

pornography together with his history of sexual contact with minors paints a troubling and dangerous picture. In its 2012 report to Congress, the Sentencing Commission noted that "some sex offenders use child pornography to 'groom' children into believing that sex with adults is appropriate." *See* Report to the Congress: Federal Child Pornography Offenses at p. 312 (available at http://www.ussc.gov/news/congressional-testimony-and-reports/sex-offense-topics/report-congress-federal-child-pornography-offenses, *last accessed* Feb. 1, 2018) (hereinafter the "2012 Report.") Moreover, "for some individuals, obtaining sexual gratification through the use of child pornography is a risk factor for other sex offending against minors . . . ," particularly "if other risk factors related to antisociality or sexual deviancy are also present." *Id.* For some higher-risk offenders, research posits that "child pornography permits a progression from viewing child pornography to sex offending against minors." *Id.*

While there is no evidence that Defendant used his child pornography collection to groom his teenage victims, his sexual interest in minors and his willingness to act upon those sexual urges suggests 1) a level of sexual deviancy, and 2) that he is not averse to engaging in risky sexual behavior. This is a troubling combination for someone with Defendant's particular proclivities.

Compounding these concerns is Defendant's employment in an area that gave him access to especially vulnerable children. Defendant holds a certificate in nursing and was employed at the time of his arrest as a licensed practical nurse at a nursing home. Previously, however, Defendant was employed as a nurse caring for disabled children. While there is no evidence that Defendant sexually abused any of his patients, he did develop inappropriate relationships with teenage girls he met through his patients. For instance, Defendant told investigators that one of his former patients had a sixteen-year-old sister, "A," with whom he began communicating via

5

social media. He then befriended "S," a friend of "A" who was also sixteen. At the time of his arrest, Defendant had pictures on his phone of "S" in her bra and panties.

Defendant described his online escapades with teenage girls as a "game." He maintained long-term relationships with numerous teenage girls that included chatting, sexting, and sending and receiving pornographic images. He explained that his sexual encounter with the sixteen-year-old girl in Michigan was an "experiment" that he undertook when he began experiencing impotence with his wife, and explained that he liked young girls because of their "perfect bod[ies]," "energy," "spirit," and "sexual appetite."

It is unclear whether Defendant's interest in child pornography developed before, after, or at the same time as his inappropriate relationships with teenage girls. Regardless, the co-existence of these characteristics indicates that Defendant presents a greater danger to the community—and to minors in particular—than the typical child pornography offender.

### C.  Seriousness of the Offense, Deterrence, Respect for the Law, Protection of Public, and Just Punishment

A high-end guideline sentence will reflect the seriousness of Defendant's offense and achieve the important sentencing objectives of deterrence and promoting respect for the law. Importantly, a high-end sentence will protect the community from future crimes of Defendant. It will send a message to Defendant and others who create a market for child pornography that the sexual exploitation of children is a serious offense that society is not prepared to tolerate.

Congress, the Supreme Court, and the Sentencing Commission believe that general deterrence is a very important factor when considering an appropriate sentence in child exploitation cases. *United States v. Irey*, 612 F.3d 1160, 1206, (citing *United States v. Ferber*, 458 U.S. 747, 760 (1982) ("The most expeditious if not the only practical method of law

enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product"); *Osbourne v. Ohio*, 495 U.S. 102, 109-10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand"); *United States v. Goff*, 501 F.3d 250, 261 (3rd Cir. 2007) ("Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing."); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) ("Transporting and receiving child pornography increases market demand. The greater concern under the Guidelines is for the welfare of these exploited children. The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it."). In *United States v. Goldberg,* 491 F.3d 668, 672 (7th Cir. 2007), the court opined that:

> Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded – both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

The Sixth Circuit has even reversed the district court in at least one case for failing to recognize the importance of general deterrence as a sentencing factor in child pornography cases. *See United States v. Bistline*, 665 F.3d 758, 767 (6th Cir. 2012). The Sixth Circuit found the district court's failure in this regard "inexplicable and in . . . conflict[] with our statement that 'general deterrence is crucial in the child pornography context[.]'" *Id.* (citing *United States v.*

*Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010)).

## IV. Sentencing Recommendation

Finally, in support of its request for a high-end sentence, the United States directs the Court to the following factors that the U.S. Sentencing Commission has outlined as important considerations in non-production child pornography offenses:

1) the content of an offender's child pornography collection and the nature of an offender's collecting behavior (in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology);

2) the degree of an offender's engagement with other offenders – in particular, in an internet "community" devoted to child pornography and child sexual exploitation; and

3) whether an offender has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense.

*See* 2012 Report at p. 320.   The report explains that even if only one of these aggravating factors is present, an enhanced punishment is warranted.   *Id.* at 321.   And if the defendant has aggravating factors in more than one category, then a more severe sentence is in order.   *Id.*

The first and third factors are especially relevant in this case.[4]   Regarding the first factor, and as previously noted, the volume of Defendant's collection is overwhelming.   Defendant possessed over 88,000 images and 2,600 videos of child pornography.   The content did not reflect

---

4 There is no evidence that Defendant regularly engaged with others who share his interest in child pornography.

8

a preference for a particular age or genre, but included children of every age, including infants. Similarly, the sexual conduct depicted in Jann's collection ran the gamut from child erotica to hardcore child pornography. One representative video depicts a post-pubescent male raping a toddler who can be heard crying while she is being penetrated. The male then turns the child over onto her stomach and attempts to rape her anally.

    Defendant was also meticulous in the manner in which he maintained his collection. After downloading images from the Darknet onto his laptop, Defendant would transfer images over to an external hard drive for long-term storage. He kept his collection hidden in a file folder that appeared to be an audio book file. Within that file, Defendant collection was organized by genre into numerous subfolders. The United States submits that the nature of Defendant's collecting behavior together with the content of his collection adds to the seriousness of his offense.

    As to the third factor, the United States submits that Defendant's use of the internet and social media to groom teenage girls for sexual relationships, while perhaps not technically illegal,[5] constitutes otherwise predatory behavior. This conduct would be deplorable enough if it were limited to chatting, sexting, and exchanging pornographic images with teenage girls, but Defendant took his relationships with at least some of these girls a step further and actually met them in person to engage in sexual activity.

    Consistent with the Commission's recommendation, the presence of these factors supports a sentence at the upper end of the guideline range.

---

5 Defendant informed investigators that in Michigan and Alabama—where his in-person encounters with teenage girls took place—the age of consent is sixteen.

## V.  Restitution

To date, the United States has received requests for restitution on behalf of four victims—"Emily," the victim in the "Tightsngold" series, and "Ava," "Mya," and "Pia," the victims in the "Sweet Sugar" series.[6]  "Emily" has requested a total award of $15,000, and "Ava," "Mya," and "Pia" are seeking $5,000 each.  The United States has submitted the requests and supporting documentation to defense counsel and Probation, and will likewise submit the documents to the Court for review and consideration in advance of sentencing.

### A.  Restitution is Mandatory

Congress mandated that restitution be made to victims of child exploitation offenses, including the offense of conviction in the instant case.  18 U.S.C. § 2259; *Paroline v. United States*, -- U.S. --, 134 S. Ct. 1710, 1718 (2014).  In *Paroline,* the Supreme Court acknowledged the damage done to children depicted in child pornography, and reiterated that even people who simply possess such images play an "indisputable role" in the harm suffered by these children.  *Paroline*, 134 S. Ct. at 1727.

Noting the "somewhat atypical causal process" in "this special context," the Court in *Paroline* focused on the cumulative and ongoing nature of the injury.  *Id*. at 1722; 1727.  And, despite the fact that there is no clear or easy way to apportion responsibility for the damage inflicted, the Court found that

> [w]here it can be shown both that a defendant possessed a victim's images and that a victim has outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259

---

6 These pseudonyms have been assigned to the minor victims by their representatives to protect their identity and privacy.  The representatives have requested that these pseudonyms be referenced on any restitution payment ordered by the Court.

10

>should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses. The amount would not be severe…given the nature of the causal connection between the conduct of a possessor…and the entirety of the victim's general losses from the trade in her images, which are the product of acts of thousands of offenders. It would not, however, be a token or nominal amount. The required restitution would be a reasonable and circumscribed award imposed in recognition of the indisputable role of the offender in the causal process underlying the victim's losses and suited to the relative size of that causal role. *Id.* at 1727.

The question then is not whether to order restitution, but rather how to calculate the amount to assess.

### B. Establishing Causation

The restitution statute defines a victim as "the individual harmed as a result of a commission of a crime under this chapter." 18 U.S.C. § 2259(c). It does not, however, state how courts should determine causation. Eschewing a "but-for" causation test and finding no practical way to isolate and attribute some identifiable portion of the victims' harm to any particular defendant, the Court in *Paroline* determined that "alternative and less demanding causal standards" are appropriate in cases such as these. *Id*. at 1724. Therefore, while the harm a victim endured must still be proximately caused by defendant's conduct, the fact that a specific portion of the losses cannot be traced to an individual defendant under a more traditional causal theory does not preclude a restitution order. *See id*. at 1727. And as the Court further noted, because the cause of a child pornography victim's general losses is the past, present *and future* trading of her images, everyone who exchanges, shares, and views the images is part of the cause. *Id*. at 1726. Proximate cause is practically inherent in the offense itself.

If a victim's photos are in a defendant's possession, then his conduct contributed to the harm the victim suffers each time a photo is viewed, traded, or distributed. The child in this

11

situation is a victim pursuant to § 2559 and *Paroline*, and as such, is entitled to restitution.

### C. Apportioning Responsibility

The next challenge is determining how to apportion responsibility among the practically limitless number of individuals who might now, or in the future, possess a victim's images. The *Paroline* Court declined to suggest a method for district courts to use in calculating the amount of restitution owed by a particular defendant. *Id.* at 1728. However, the Court did make it clear that once the amount of loss and proportional responsibility has been calculated, the defendant should be held accountable for the full amount of the victim's general losses that are the proximate result of his conduct. *Id*.

The *Paroline* Court suggested several factors a district court "might consider" in determining the "relative causal significance of the defendant's conduct in producing [the victim's] general losses." *Id.* These factors include: the number of defendants who have already been found to have contributed to the losses; reasonable predictions of the number of likely future defendants who will be found responsible for such harm; and "reasonably reliable" estimates of the broader number of offenders who are harming the victim but who will not necessarily be caught, prosecuted, and convicted. *Id*. Other relevant facts include whether the defendant distributed the images, the number of images of a particular victim the defendant possessed, and whether the defendant played a part in the production of the images. *Id*. Even with this guidance, however, the Supreme Court recognized the difficulties inherent in this approach and asked lower courts to "do their best" in exercising their "discretion and sound judgment" when fashioning restitution awards in child pornography cases. *Id.* at 1728-29.

One example of a district court in the Sixth Circuit validly exercising this discretion is

*United States v. Reynolds*, 626 Fed. App'x. 610 (6th Cir. 2015).  In *Reynolds*, the district court considered the *Paroline* factors and ordered restitution on behalf of two victims in amounts of $11,000 and $15,500 respectively.  *Id.* at 620.  The court arrived at these amounts by starting from a baseline of $1,000 per victim and increasing it based on various factors, including the number of images the defendant possessed and the sadistic and graphic nature of those images. *Id*.  On appeal, the Sixth Circuit affirmed the restitution award and rejected the defendant's argument that the amounts were speculative, observing that the Supreme Court "gave the district court broad discretion to calculate restitution with limited guidance."   *Id*.

Another recent example is *United States v. Barry*, 647 Fed. App'x. 519 (6th Cir. 2016), in which the Sixth Circuit affirmed a restitution award in the amount of $50,540, which included $10,000 in punitive damages.  *Barry*, 647 Fed. App'x. at 521.  The defendant in *Barry* was convicted of possession of child pornography.   The sizable restitution award ordered in that case was awarded to a single victim who was depicted in three images within the defendant's collection.

Some district courts disregard future therapeutic costs as a factor in determining restitution for victims (*see Barry*, 647 Fed. App'x. 519), but courts in other circuits have considered such costs and have been affirmed, if such costs were reasonable.  *See United States v. Osman*, 853 F.3d 1184 (11th Cir. 2017) (affirming the district court's consideration of future expenses, including therapeutic costs in determining restitution).  Courts of Appeal for the First, Second, Fifth, Sixth, Seventh, Ninth, and Tenth Circuits have affirmed the consideration of future therapeutic costs if they were reasonably estimated. *See United States v. Rogers*, 758 F.3d 37, 39–40 (1st Cir. 2014); *United States v. Pearson*, 570 F.3d 480, 486–87 (2d Cir. 2009); *United States v. Dans*er, 270 F.3d 451, 455–56 (7th Cir. 2001); *United States v. Julian*, 242 F.3d 1245, 1246–48

13

(10th Cir. 2001); *United States v. Laney*, 189 F.3d 954, 966–67 (9th Cir. 1999); *United States v. Serrata*, 2017 WL 568324, at *2 (5th Cir. 2017).

Of particular note here is the Sixth Circuit's decision in *United States v. Fontana*, 2017 U.S. App. LEXIS 23102 (6th Cir. 2017). The Court in that case vacated the restitution order in regard to the $10,000 requested for hospital costs incurred because only $7,242 of it was paid by the victim. *Fontana*, 2017 U.S. App. LEXIS 23102 at *4. However, the Court affirmed the district court's decision to award $7,680 for four years of future therapy sessions for the victim, which the district court found was reasonable and adequately supported by the record. *Id*. at *4-5.

Finally, and in view of the reality that restitution awards in child pornography cases have varied considerably in individual cases, the United States would direct the Court's attention to proposed legislation that would amend 18 U.S.C. § 2259 to provide the courts with additional guidance regarding the determination of appropriate restitution amounts.[7] Though not binding, this proposed legislation is instructive of Congress' intent with respect to restitution in child pornography cases and provides this Court with a helpful framework for assessing the reasonableness of the victims' requests in this case. The framework set forth by Congress would direct courts to first determine the full amount of a victim's losses, and then to enter an award of restitution which is between $3,000 and 1 percent of the full amount of the victim's losses. In view of these helpful guideposts, the United States respectfully submits that the amounts requested in the instant case are reasonable.

---

7 As of January 25, 2018, this legislation, S. 2152 (attached hereto as an exhibit), has been referred in the House to the Committee on the Judiciary.

14

### D. Recommendations

In *Paroline*, the Supreme Court left no doubt that "everyone who reproduces, distributes, or possesses the images of the victim's abuse…plays a part in sustaining and aggravating this tragedy" of trafficking in child pornography. *Id*. at 1726. Furthermore, "there can be no doubt Congress wanted victims to receive restitution for harms like this." *Id*. at 1726. Victims of child pornography should "be compensated by the perpetrators who contributed to their anguish." *Id*. That compensation should be neither severe nor trivial, but should fit the offense conduct. *Id*.

In this case, the United States submits that restitution in the amounts requested is appropriate and reasonable under the circumstances. "Emily" has requested an award of $15,000, "or an amount the court deems fair and just." The documentation submitted on behalf of "Emily" reflects estimated total damages of $545,500 over the course of "Emily's" lifetime. The amount sought on "Emily's" behalf represents about 2.7 percent of her total damages. The documentation submitted on behalf "Ava," "Mya," and "Pia" reflect total estimated damages in the following amounts:

- "Ava" - $94,800
- "Mya" - $94,800
- "Pia" - $91,900

The award sought—$5,000 per victim—represents approximately 5 percent of each victim's damages.[8] The amounts sought are supported by ample documentation, are neither trivial nor severe, and are reasonably related to helping the victims cope with the emotional repercussions of

---

8 It should also be noted that the documentation submitted reflects an additional $10,187 in actual, out-of-pocket costs incurred, largely for fees associated with the victims' forensic evaluations.

15

worldwide dissemination of images of their sexual abuse. This acknowledges the harm the defendant caused the victims by obtaining and viewing their images.

## VI. Conclusion

The United States respectfully submits that the Court should impose a sentence of 121 months' imprisonment and order restitution in the amounts set forth above—$15,000 for "Emily," and $5,000 each for "Ava," "Mya," and "Pia."

        Respectfully submitted,

        D. MICHAEL DUNAVANT
        United States Attorney

By:   /s/ Kasey A. Weiland
        Assistant United States Attorney

## CERTIFICATE OF SERVICE

I, Kasey A. Weiland, Assistant United States Attorney, do hereby certify that a copy of the foregoing was forwarded by electronic means, via the Court's Electronic Filing System, to Christina Wimbley, Esq., Attorney for Defendant.

This 6th day of February, 2018.

    /s/   Kasey A. Weiland
Assistant United States Attorney